Argued September 9; affirmed December 2, 1941

# UNION PACIFIC RAILROAD CO. ET AL. *v.* BEAN ET AL.
### (119 P. (2d) 575)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*William P. Ellis*, of Salem (I. H. Van Winkle, Attorney General, Willis S. Moore, Assistant Attorney General, and John Carkin, of Salem, on the brief), for Ormond R. Bean et al.

*William B. Adams*, of Portland (J. M. Hickson and Johnston B. Campbell, both of Portland, on the brief), for Pacific Inland Tariff Bureau et al.

*C. W. Robison*, of Portland for International Brotherhood of Teamsters, etc., appellants.

*Roy F. Shields* and *L. W. Hobbs*, both of Portland, for Union Pacific Railroad Co.

*Hart, Spencer, McCulloch & Rockwood*, of Portland, for Spokane, Portland & Seattle Railway Co.

*Cochran & Eberhard*, of La Grande, for Union Railroad of Oregon.

BAILEY, J. This suit was instituted by Union Pacific Railroad Company, Spokane, Portland & Seattle Railway Company and Union Railroad of Oregon, all corporations, against the defendants, Ormond R. Bean as public utilities commissioner of Oregon and I. H. Van Winkle as attorney general of Oregon, for a declaratory judgment as to the authority of the commissioner under § 113-116, O. C. L. A. (chapter 59, Laws 1913), to order the suspension of proposed reduced intrastate rates contained in a schedule filed by the railroad companies with the commissioner,

pending an investigation and determination of the reasonableness of such rates, and the applicability of chapter 320, Oregon Laws 1939 (§§ 112-4,111 to 112-4,122, inclusive, O. C. L. A.), providing the procedure before the commissioner, to the suspension of proposed rates; and for a decree setting aside and vacating orders of the commissioner suspending proposed reduced intrastate rates and enjoining and restraining the defendants from enforcing or attempting to enforce such orders.

Pacific Inland Tariff Bureau and others were granted permission to, and did, intervene and file answers limited to the issues of fact raised by the defendants in their answer. From a decree in favor of the plaintiffs and against the defendants the latter and the interveners have appealed.

The material facts of the case are not in dispute. They are substantially the following: Spokane, Portland & Seattle Railway Company operates lines of railroad extending from Linnton and Willbridge in Multnomah county to Portland, where the same connect with lines of Union Pacific Railroad Company, and by means of such connection freight and freight cars are interchanged by and between the two railroad companies. Union Pacific Railroad Company operates a main-line railroad extending from Portland easterly along the south bank of the Columbia river to Umatilla and thence southeasterly to Huntington, Oregon, and certain branch lines connecting with and extending from its main line to points within the state of Oregon. Union Railroad of Oregon operates a line of railroad extending from the station of Union Junction on the main line of the Union Pacific railroad to the town of Union, Oregon, and by means of that

connection freight and freight cars are interchanged between these two railroad companies.

At the time of the institution of this suit and for some years prior thereto the plaintiffs, hereinafter to be referred to as the carriers, were engaged in transporting petroleum (and "petroleum" as herein used also includes petroleum products) in tank car lots from Linnton, Willbridge and Portland to stations on the main and branch lines of the Union Pacific and the line of Union Railroad of Oregon. The freight rates and charges for such transportation were prescribed and published in a certain tariff and supplements thereto issued by the carriers through their tariff publishing agent, W. J. Bohon, and duly filed in the office of the commissioner of public utilities, which tariff was known and designated as "North Pacific Coast Freight Bureau Local, Joint and Proportional Freight Tariff No. 14-N, P. U. C. Oregon No. 467". This tariff, together with supplements in effect November 15, 1939, will hereinafter be referred to as the original tariff.

Most of the petroleum used at or in the vicinity of stations along the lines of the carriers in Oregon has been, for many years, shipped in private tank steamers from California points to Linnton, Willbridge and Portland and there stored pending intrastate movement. At the present time and for some years past the business of transporting petroleum from the bulk storage plants at Linnton, Willbridge and Portland to points along the lines of the carriers "was and is highly competitive. During all said times, plaintiffs have been and are engaged in such business in competition with non-rail transportation agencies, some of which are subject to regulation by the commis-

sioner as to rates and charges, while others are not subject to any public or governmental regulation whatsoever with respect to rates or charges.''

In March, 1939, the carriers filed with the commissioner their supplement No. 5 to the original tariff. The effective date stated in the supplement was April 10, 1939. The supplement proposed to reduce the then existing intrastate railroad rates on petroleum below those listed in the original tariff. On April 8, 1939, the commissioner by order No. 6506 in cause F-1909 instituted an investigation of the reduced rates named in supplement No. 5 and ordered that such rates be suspended pending investigation.

The hearing in cause F-1909 was conducted by the commissioner in conjunction with the hearing by the Interstate Commerce Commission in its cause I & S No. 4614, involving interstate rates on petroleum, and the hearing by the department of public service of the state of Washington in regard to intrastate rates on petroleum in that state.

The Interstate Commerce Commission on September 25, 1939, rendered its decision concerning interstate rates on petroleum. During the hearing before the Interstate Commerce Commission the suspension of Oregon intrastate rates named in supplement No. 5 was continued from time to time by the orders of the Oregon commissioner entered in cause F-1909.

After the decision by the Interstate Commerce Commission above referred to, the carriers entered into an informal discussion with the commissioner for the purpose of arriving ''at a basis of rates for Oregon intrastate application which'' the commissioner ''believed would harmonize with said decision of the Interstate Commerce Commission in its cause I & S No.

4614, which Interstate Commerce Commission order the commission assumed would become effective simultaneously with supplement 16-C", presently to be mentioned.

On November 3 or 4, 1939, the carriers through their tariff publishing agent, W. J. Bohon, issued to become effective November 15, 1939, and filed in the office of the commissioner, supplement No. 16-C to the original tariff. This supplement described reduced freight rates for the transportation of petroleum in railroad tank cars from Linnton, Willbridge or Portland to each of the destination points named in the tariff, which rates, as those in the original tariff, were "stated in cents per 100 pounds based on the full shell gallonage capacity of the tank car, the minimum weight of each such tank car load being fixed at 52,800 pounds for the purpose of applying such rates."

At the time of filing supplement No. 16-C the "carriers believed, and had reasonable cause to believe, that the same would not be suspended but would become effective on November 15, 1939, the effective date stated in said supplement, and had they not so believed, the plaintiff carriers would not have filed said supplement No. 16-C."

Under date of November 14, 1939, the commissioner issued "P. U. C. Oregon order No. 6960" suspending the rates and minimum weights proposed in supplement No. 16-C until January 8, 1940, unless otherwise ordered by the commissioner. He also entered on November 14, 1939, "P. U. C. Oregon order No. 6962", in which it is recited that supplement No. 16-C was filed November 4, 1939, "to become effective November 15, 1939, naming new rates and minimum weights to be applied on Oregon intrastate traffic for the trans-

portation of petroleum and petroleum products in tank cars *superseding those contained in supplement No. 5* [our italics] to P. U. C. O. No. 467, North Pacific Coast Freight Bureau Local, Joint and Proportional Freight Tariff No. 14-N, under suspension in the above-entitled proceeding, * * * It is now therefore ordered that the above-entitled proceeding [the investigation and suspension of supplement No. 5] be and the same hereby is dismissed.''

On December 28, 1939, the complaint herein was filed by the plaintiffs.

The commissioner on January 5, 1940, issued "P. U. C. Oregon order No. 7091" continuing the suspension until February 7, 1940, unless otherwise ordered by him, and in the same order set for hearing the question of the "lawfulness of the rates, charges, regulations and practices stated in" supplement No. 16-C. Other orders were thereafter issued by the commissioner continuing the suspension of the proposed rates, one, No. 7159, on January 27, 1940, extending the suspension until April 8, 1940, and another, No. 7256, on March 12, 1940, extending the suspension until September 12, 1940.

After supplement No. 16-C was filed by the plaintiffs, the order of the Interstate Commerce Commission issued pursuant to its decision of September 25, 1939, concerning interstate rates on petroleum, was attacked in the federal court by certain rail carriers: *Scandrett et al. v. United States*, 32 F. Supp. 995. From a decree upholding the Interstate Commerce Commission's order the plaintiffs therein appealed to the United States supreme court, which on March 10, 1941, affirmed the decree: 312 U. S. 661, 61 S. Ct. 736, 85 L. Ed. 1108. The result of the institution of

that suit was to postpone the effective date of the rates prescribed in the Interstate Commerce Commission's order.

In the case before us, the plaintiffs allege that order No. 6960, entered by the commissioner on November 14, 1939, suspending the rates included in supplement No. 16-C "was and is arbitrary, unreasonable, unlawful and void, and should be vacated and set aside and its enforcement enjoined," for numerous reasons therein given. Following are some of the reasons stated: 1. That no complaint against the carriers or any of them, involving or referring to supplement No. 16-C or any of the rates therein prescribed, "was ever filed by said commissioner or by any person or party whomsoever." 2. That prior to the entry of such suspension order no hearing whatever "was called or held for the purpose of investigating said supplement No. 16-C or any of the rates therein prescribed". 3. That "supplement No. 16-C did not state or establish any new individual or joint rate, fare, charge, practice, regulation or classification, nor did it increase any existing intrastate individual or joint rate, fare or charge, or change or alter any existing individual or joint practice, regulation or classification. On the contrary, the sole purpose and effect of said supplement No. 16-C was to reduce then existing rates under then existing regulations, classifications and practices; and the commissioner was without power to suspend said reduced rates pending an investigation thereof, or otherwise."

It is next alleged that ever since order No. 6960 was entered the defendants have contended and now claim: That under § 113-116, O. C. L. A.; the commissioner had jurisdiction and power to enter such order

without prior complaint, notice to the carriers, investigation or hearing; that any change in the amount of any existing freight rate between any two points is a "new" rate within the meaning of § 113-116, *supra*, and that the reduced rates proposed in supplement No. 16-C were "new" rates within the meaning of that section; that chapter 320, Oregon Laws 1939, did not and does not affect any proceedings under § 113-116, *supra*, and did not repeal, supersede or amend that section; that order No. 6960 was properly and lawfully entered; that the same is valid, lawful and enforcible; and that "the defendant commissioner has the power, without prior complaint, notice to the carriers, investigation or hearing, to suspend the operation of any future tariff of plaintiffs, or any of them, whereby then existing freight rates would be reduced."

The complaint further alleges that the "plaintiffs did at all times and do now deny and controvert each of said contentions of the defendants." It further sets forth the ground on which the plaintiffs controvert the above noted contentions and others mentioned in the complaint.

Immediately after the entry by the commissioner of each of the three orders hereinabove mentioned, extending the suspension of the proposed reduced rates listed in supplement No. 16-C, the carriers filed a supplemental complaint setting forth the respective order and alleging that it was invalid on the grounds stated in the original complaint with reference to the commissioner's order No. 6960 suspending the rates proposed in supplement No. 16-C.

The first question of law with which we are confronted is whether the commissioner has authority to

suspend proposed reduced rates contained in a schedule or schedules filed with him by railroad carriers, pending an investigation by the commissioner to determine the reasonableness and lawfulness of such rates.

The original railroad commission act was passed in 1907 (chapter 53, Laws 1907). Under that act the commission could, on its own motion, investigate any and all rates charged by rail carriers. But it had no authority whatever to suspend any proposed rail rate. In 1913 the legislature enacted chapter 59, Laws 1913, which granted to the railroad commission authority in certain instances to suspend proposed rates pending hearing and determination as to the "propriety and reasonableness of such" rates.

We are here concerned only with § 1 of the 1913 act, which now appears as § 113-116, O. C. L. A. This section has never been altered except by provisions of the public utilities act successively transferring the duties and changing the name of the railroad commission to the public service commission and from that to the public utilities commissioner. It thus reads:

"Whenever any railroad, as the same is defined in section 113-102, shall file with the railroad commission [public utilities commissioner] of Oregon any schedule stating or establishing a new intrastate individual or joint rate, fare, charge, practice, regulation or classification, or increasing an existing intrastate individual or joint rate, fare, or charge, or changing or altering any existing individual or joint practice regulation or classification, the commission [commissioner] may either upon written complaint or upon its [his] own initiative after reasonable notice conduct a hearing to determine the propriety and reasonableness of such rate, fare, charge, classification, practice or regulation. At such hearing the burden of

showing that the rate, fare, charge, classification, practice or regulation proposed to be established, increased or changed is just and reasonable shall be upon the railroad making the same. The commission [commissioner], may, pending such hearing and determination, order the suspension of the rate, fare, charge, classification, practice or regulation proposed to be established, increased or changed; provided, that the period of suspension shall not extend more than one hundred and twenty days beyond the time when such rate, fare, charge, practice, regulation or classification would otherwise go into effect unless the commission [commissioner], in its [his] discretion, extend the suspension for a further period not exceeding six months. After full hearing, whether completed before or after such rate, charge, fare, practice, regulation or classification has gone into effect, the commission [commissioner] may make such order in reference thereto as would be proper in a proceeding initiated after such rate, fare, charge, practice, regulation or classification had become effective."

■ In construing a statute, we are commanded "to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all": § 2-216, O. C. L. A.; *Astoria v. Kozer*, 124 Or. 261, 264 P. 445.

■ Section 113-116, *supra*, provides that whenever any railroad shall file with the commissioner any schedule (1) "stating or establishing a new intrastate individual or joint rate, fare, charge, practice, regulation or classification, or " (2) "increasing an existing intrastate individual or joint rate, fare, or charge, or" (3) "changing or altering any existing individual or joint practice, regulation or classification," the commis-

sioner may "conduct a hearing to determine the propriety and reasonablness of such rate, fare, charge, classification, practice or regulation." Had the legislature omitted from this section any reference to the filing of a schedule "increasing an existing intrastate individual or joint rate, fare or charge, or changing or altering any existing individual or joint practice, regulation or classification," the contention of the defendants and interveners that the commissioner, under § 113-116, *supra,* had power to suspend, during an investigation, the proposed reduced rates contained in the schedule filed by the carriers, would be persuasive.

The language used in this section with reference to increasing existing rates and changing or altering existing practices must have been inserted by the legislature for some purpose, and must, if possible, be given effect in construing the section. Were we to hold that the provision of the section concerning the filing of any schedule stating or establishing a *new rate or practice* refers to the changing of *existing rates or practices,* then the provision in the same section as to increasing existing rates and changing or altering existing practices would be mere surplusage, without force or meaning. The result of such a construction would be to delete from the section the following language: "or increasing an existing intrastate individual or joint rate, fare, or charge, or changing or altering any existing individual or joint practice, regulation or classification". All the matter last quoted, with the exception of "or increasing an existing" and "or changing or altering any existing", is found in the first sentence of the section, with reference to new rates and practices.

The section under consideration speaks of establishing new rates and increasing existing rates. Nowhere does it make any reference to reducing or lowering existing rates. According to the maxim, *"Expressio unius est exclusio alterius"*, the specific mention of an increase of existing rates must be construed as excluding a reduction of such rates.

That part of § 1 of the 1913 act, now § 113-116, *supra*, which provides that the commissioner "may, pending such hearing and determination, order the suspension of the rate, fare, charge, classification, practice or regulation to be established, increased or changed," must be read in connection with what precedes it. Therein, as in the first sentence, the word "established" is to be understood as referring to a "new" rate or practice; "increased", to an "existing" rate; and "changed", to "existing . . . practice, regulation or classification". This makes it clear that the only rates which the commissioner is authorized to suspend are those mentioned in the first sentence as new rates established, or existing rates increased. In other words, it is only the rates which the commissioner, under § 113-116, *supra*, is authorized to investigate that he has power to suspend during investigation.

■ In our opinion, the commissioner had no authority to suspend the reduced rates contained in supplement No. 16-C pending an investigation and determination as to the propriety and reasonableness of such reduced rates. The proposed rates were not new rates within the meaning of § 113-116, *supra*.

■ The defendants and the interveners call attention to the fact that dating from 1931 the commissioner has, in a few instances, entered orders suspending

proposed reduced rates, and they argue that the commissioner, therefore, has placed on the act a practical construction which the courts should follow. We have given a great deal of consideration to this argument. However, it is not without significance that from the passage of the act in 1913 until 1931 no suspension of reduced rates was, so far as the record discloses, ordered by the commissioner, or his predecessors in office. And in any view of the matter it would not be possible to adopt the construction contended for without reading into the statute something that is not there, or omitting something that it in fact contains. "It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every section, clause, word or part of the act. In applying the rule it frequently occurs that a particular construction of a provision which the court is urged to adopt can not be sanctioned, because, according to the view suggested, certain other provisions would thereby be rendered unnecessary, and it should not be presumed that any provision is redundant or useless": 25 R. C. L., Statutes, § 246, page 1004.

It is urged by the defendants and the interveners that this suit should be dismissed for the reason that chapter 320, Oregon Laws, 1939, provides a special and exclusive method for review of the orders and determinations of the commissioner. They insist that only final orders of the commissioner may be reviewed by the courts and that the orders here involved are not final within the meaning of the 1939 act. They further contend that a suit of this nature is not maintainable, for the reason that the commissioner has not completed his investigation in the matter pending before him, and they call attention to adjudications

which hold that matters within the jurisdiction of an administrative board or commission must first be determined by it, in every instance, before the courts may examine any phase of the controversy.

The carriers, on the other hand, argue that under the 1939 law above referred to, any order made by the commissioner may be reviewed, and that the commissioner's present orders of suspension and extension of suspension are, within the meaning of the 1939 act, final orders and subject to review by the courts. They also assert that they are entitled to a declaratory judgment determining the authority of the commissioner, under chapter 59, Laws 1913, to suspend reduced rates pending investigation as to the reasonableness of the same. Because of the view of this matter that we take, we do not consider it necessary to determine whether or not those orders are final within the meaning of the 1939 act.

■ The commissioner, as we have already stated, had no authority to suspend proposed reduced rates. Therefore, the orders issued by him and attacked in this proceeding were void.

Section 6-602, O. C. L. A., which has reference to declaratory judgments, provides as follows:

"Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a constitution, statute, municipal charter, ordinance, contract or franchise may have determined any question of construction or validity arising under any such instrument, constitution, statute, municipal charter, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

Section 6-608, O. C. L. A., in part reads thus:

"Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application thereof shall be by petition to a court having jurisdiction to grant the relief."

According to the pleadings in the case at bar and the arguments in the briefs of the respective parties, there exists a controversy as to the authority of the commissioner to suspend reduced rates proposed by carriers. On some occasions, beginning in 1931, the commissioner has issued orders temporarily suspending reduced rates pending investigation. In each instance he has thereafter vacated his order of suspension, thereby depriving the carriers, after the proceedings have been closed, of opportunity to review the authority of the commissioner to issue such orders.

██ Borchard on Declaratory Judgments, 2d Ed., page 342, with reference to whether an issue should be tried by declaration when a special procedure in regard to it has been provided by law, says:

"Thus, a court should not by declaratory judgment ordinarily interfere with the jurisdiction of an administrative commission, especially where the statute is not ambiguous and where the jurisdiction of the commission depends on a jurisdictional fact, * * *

"But this is quite different from asserting that whenever there is an administrative method of relief it is necessarily exclusive. If the question is one of law or of the jurisdiction of the commission, it may be judicial economy and wisdom to decide the issue by declaration before the administrative channel has been invoked or exhausted. * * *"

█ In the instant case the question is that of the jurisdiction of the commissioner to order the suspension of reduced rates pending investigation. The court is

not here asked to pass upon any question involving administrative functions or to determine a question of fact properly to be passed on first by an administrative officer or board.

It is our opinion that this is a proper case for a declaratory judgment; that the circuit court correctly construed § 113-116, O. C. L. A.; that the pleas in abatement were properly denied; and that no error was committed by the circuit court in setting aside and vacating the orders of the public utilities commissioner hereinabove described. We express no opinion as to the construction to be placed on chapter 320, Oregon Laws 1939, regulating proceedings before the commissioner, inasmuch as no justiciable issue here remains in regard to it. With this reservation, we affirm the decrees from which the defendants and the interveners have appealed. No costs will be allowed.